# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| KATHLEEN L. CULLETT, )   | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 12-cv-1501 |
| ) | |
| ) | |
| KANAWHA INSURANCE COMPANY, ) | |
| A HUMANA COMPANY, ) | |
| ) | |
| Defendant. ) | |

# O R D E R  &  O P I N I O N

This matter is before the Court on cross-motions for summary judgment. Each of the parties has filed a Motion for Summary Judgment, and each Motion is fully briefed. For the reasons that follow, both parties' motions are denied.

### PROCEDURAL HISTORY

On December 4, 2012, Plaintiff Kathleen Cullett filed this ERISA lawsuit, alleging that Defendant Kanawha Insurance Company terminated her long-term disability benefits in violation of the policy's provisions and 29 U.S.C. § 1133. The amended Complaint requests that the Court order Defendant to pay benefits it has withheld from her, reinstate her terminated long term disability benefits, pay attorney's fees, and order any other relief it deems necessary and appropriate. (Doc. 13). Defendant previously requested that the Court consider its termination of Plaintiff's benefits under an arbitrary and capricious standard of review rather than a de novo standard. (Doc. 17). Magistrate Judge Gorman denied Defendant's motion in an order filed on August 13, 2013, (Doc. 30), which neither party appealed.

Discovery closed on August 1, 2014, and this matter now proceeds to summary judgment.

**STANDARD OF REVIEW**

The parties agree that, following the Magistrate Judge's ruling, the Court must conduct a *de novo* review of Defendant's termination of Plaintiff's benefits, rather than a review for arbitrariness and capriciousness. As the Seventh Circuit has acknowledged, *de novo* review is a misleading label. *Krolnick v. Prudential Ins. Co. of America*, 570 F.3d 841, 843 (7th Cir. 2009). *De novo* review "is not 'review' of any kind; it is an independent *decision* rather than 'review.'" *Id.* The question before the Court is not whether Defendant provided Plaintiff "a full and fair hearing or undertook a selective review of the evidence; rather it [is] the ultimate question" of whether Plaintiff is entitled to the benefits sought under the Plan. *Diaz v. Prudential Ins. Co. of America*, 499 F.3d 640, 643 (7th Cir. 2007). The parties' evidence is not limited to the administrative record, and "if material evidence conflicts, then there must be a trial." *Krolnick*, 570 F.3d at 843.

Although the Court must come to an independent decision on both legal and factual issues that form the basis of the claim, *Diaz*, 499 F.3d at 643, the factual record developed during the administrative proceeding is not irrelevant. Rather, the Court may consider evidence included in the administrative record and other evidence developed through discovery. *See Krolnick*, 570 F.3d at 843.

Summary judgment shall be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary

2

judgment, the Court must view the evidence in the light most favorable to the non-moving party. *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant. *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011).

To survive summary judgment, the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which he bears the burden of proof at trial." *Warsco v. Preferred Technical Grp.*, 258 F.3d 557, 563 (7th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *See McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). At the summary judgment stage, the court may not resolve issues of fact; disputed material facts must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

Cross-motions for summary judgment are considered separately, and each party requesting summary judgment must satisfy the above standard before judgment will be granted in its favor. *See Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004); *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). Thus, the facts are construed in favor of the non-moving party, which differs depending on which motion is under consideration. *Tegtmeier*, 390 F.3d at 1045.

# FACTUAL BACKGROUND[1]

On February 27, 2012, Defendant Kanawha Insurance Company terminated Plaintiff Kathleen Cullett's long-term disability benefits, which she received through her employment with OSF Healthcare. Defendant terminated the benefits because it determined that she no longer met the long-term disability benefits policy's definition of disability. Specifically, it determined that she could perform the essential duties of her occupation.

OSF Healthcare provides its employees with long term disability insurance ("the Plan"), which it purchased from Defendant. Under the Plan, participants may collect benefits following the conclusion of an elimination period. The elimination period is the later of "the first consecutive 180 days of any one period of Disability" or "the expiration of any Employer sponsored short term disability benefits or salary continuation program." (Def.'s Ex. 3, beginning at Doc. 54-3 at HA 00008) (hereinafter, documents contained in the administrative record will be identified by their bates-number, which begins with the prefix "HA"). In the twenty-four months following the elimination period, Plan participants are considered disabled if they "are prevented from performing one or more of the Essential Duties of [Their] Occupation, and as a result, [their] Current Monthly Earnings are less than 80% of [Their] Indexed Pre-disability Earnings." (HA 00011). Following the twenty-four month period, Plan participants are considered disabled if they are "prevented from performing one or more of the Essential Duties of Any Occupation." (*Id.*).

---

[1] Unless otherwise indicated, these background facts reflect the Court's determination of the undisputed facts, and are drawn from the parties' statements of facts and responses thereto. (Docs. 53, 54, 58, and 59).

The Plan defines an "Essential Duty" as a duty that "is substantial, not incidental," "is fundamental or inherent to the occupation," and "cannot be reasonably omitted or changed." (HA 00012). An employee's ability to work the number of hours required by a regularly scheduled work week is considered an Essential Duty. (*Id.*). "Your Occupation" is not "the specific job [an employee is] performing for a specific Employer or at a specific location," but is rather "Your Occupation as it is recognized in the general workplace." (HA 00015). "Any Occupation" is an occupation for which the employee is qualified and that has an earning potential greater than the lesser of 60% of pre-disability earnings or $10,000. (HA 00011).

Plaintiff's road to receiving long-term disability insurance benefits began in 2010, when she checked herself in to the Emergency Room with symptoms of weakness and dizziness on the recommendation of her primary care physician, Dr. Randolph McCrea. After hospital staff gave her an SSA blood test, she was diagnosed with Sjogren's syndrome. Sjogren's syndrome is a chronic autoimmune disease in which the body's white blood cells destroy the exocrine glands. This causes a lack of moisture in the exocrine glands. In addition to Sjogren's syndrome, Plaintiff has been diagnosed with other autoimmune diseases, including fibromyalgia and Grave's disease.

Plaintiff reports that the Sjogren's syndrome and fibromyalgia cause her to suffer from exhaustion, fatigue, vertigo, dizziness, discomfort and pain in her extremities, swelling and severe pain in her parotid glands, and difficulties swallowing. As a result, she reports that she has not been able to stand or walk for

an eight hour period, she cannot stand or walk for an hour without taking time to rest for some period, she has reduced ability to use her hands, she cannot lift or carry many objects, she is constantly sluggish, she suffers from intermittent migraines, and she can only drive locally, around fifteen miles at a time.

Plaintiff explains that she has good days and that she has bad days. On good days, she can get through a day as long as she can sit or lie down for three to four hours. Although she constantly feels weak on good days, she reports that she can lift light items and also walk for short periods of time. Meanwhile, on bad days she reports that she must lie down for the majority of the day and sleep for more than three hours during the day. She feels pain in her extremities that keeps her from walking up stairs or on hard surfaces, regularly feels dizzy, and must rest every half-hour.

She further explains that although she cannot predict when she will have a good day or when she will have a bad day, she rarely experiences consecutive days of high functionality. She reports that there has not been a single stretch of five consecutive days in which she has been able to stay out of bed for eight hours since 2010.

Plaintiff maintains that this has impacted her ability to do her job. When she began receiving long-term disability benefits, Plaintiff was employed by OSF Healthcare as a Value Analysis and Clinical Resource Coordinator. It is undisputed that Plaintiff's job required that she work forty hours a week, and often required that she work fifty to sixty hours a week, including work on weekends and evenings. It is also undisputed that Plaintiff traveled regularly as part of her job, and that she

drove anywhere from thirty to 250 miles per day. Plaintiff says that her symptoms prevent her from working a full forty hours a week and also disable her from traveling as far as is required by the job.

OSF Healthcare submitted a position description along with Plaintiff's claim that said her regularly scheduled work week is forty-hours per week, and that she frequently must stand, walk, sit, and use a keyboard. It stated that she occasionally must balance, stoop, kneel, crouch, and reach overhead. The position description included a number of identified essential job functions, but noted that "[t]ravel[ing] as required and participat[ing] in industry, supplier, and organization programs and events which are valuable to personal and organizational development/growth" is a "marginal position function." (HA 00755-56).

Plaintiff applied for short-term disability insurance, which she received until early April 2011. On March 22, 2011, after the Elimination Period closed, Defendant approved her claim for long-term disability benefits. She received $3,207.36 per month in benefits, beginning April 6, 2011. On February 27, 2012, Defendant terminated Plaintiff's long term disability benefits.

Two of Plaintiff's treating physicians have concluded that her symptoms prevent her from working a complete work week. Their conclusions are based on her self-reported symptoms. Dr. McCrea has served as Plaintiff's primary care physician for twenty-three years. He asserts that her "reports of her physical condition have always been credible and entirely consistent with the symptoms associated with Sjogren's syndrome." (Pl.'s Ex. B, Doc. 53-2, at 3). He further asserts that she "has been a compliant patient who has consistently tried to

maximize her function-ability despite the debilitating symptoms she suffers." (*Id.*) On this basis, he has concluded that Plaintiff "has been unable to perform her job at OSF on a full time basis or any sedentary work on a full time basis since 2010." (*Id.* at 4).

Dr. McCrea referred Plaintiff to rheumatologist Dr. Mark Getz in 2010, after her trip to the emergency room. Plaintiff has seen Dr. Getz on six occasions. Although Dr. Getz reports that the physical tests he has performed on her have yielded normal results, he concluded that "the diseases that she had do produce fatigue." (Def.'s Ex. 9, Doc. 54-25, at 58). He credited her report that "her fatigue is too difficult to manage to continue working full time without taking breaks that were not accommodated by her employer." (*Id.* at 24-25). Dr. Getz said that he is unaware of any objective tests he could conduct to determine the degree of Plaintiff's fatigue and said that there is "nothing in the way she would report that was inconsistent with what I see in the – not uncommonly in the type of diseases that she reports. The constellation of symptoms was consistent with the disease that she had, and her affect and function seemed to all be consistent with the gestalt of credibility." (*Id.* at 66)

Defendant referred Plaintiff's claim to its claims investigation unit after reviewing Dr. McCrea's office notes from January 13, 2011, which stated that Plaintiff did not tolerate an attempt to return to work, perhaps in part because of the emotional toll caused by working with a manager with whom she had had conflict. As part of its investigation, Defendant made surveillance videos of Plaintiff over four days in July. The surveillance videos show Plaintiff engaging in a number

of activities over the course of the day, including walking, standing, entering and exiting a vehicle, driving, running errands, watering her lawn, weeding, and exercising in her pool. On one day in which Plaintiff was surveilled, she was away from her home for about five hours. On another day, she gardened and exercised in her pool for over an hour.

As part of its investigation, Defendant's claim investigator interviewed Plaintiff over two days in September 2011. Defendant also sent copies of the surveillance videos to Dr. McCrea, Dr. Getz, and Plaintiff's ear nose and throat doctor, Dr. Robert Parrish, and requested that they review the videos and comment on Plaintiff's ability to perform her job. Both Dr. McCrea and Dr. Getz responded that the video was consistent with their diagnoses and that Plaintiff did not have the functionality necessary to do her job. Dr. Parrish responded that, from an ear nose and throat perspective only, Plaintiff had the functionality needed to complete her job.

Defendant then referred the claim to Dr. Ibrahim Alghafeer, for a so-called independent review. Dr. Alghafeer, who is Board Certified in Rheumatology, reviewed Plaintiff's medical records, her self-reported statements of functionality, and the surveillance videos. He also spoke with Dr. Getz and Dr. McCrea. Following the review, he concluded that Plaintiff did not have physical restrictions. He based his opinion on the fact that musculoskeletal exams failed to document physical impairments, her physicians made no medical findings related to muscle weakness, Dr. Getz's statement that there is no way for him to measure fatigue and that he

relies upon Plaintiff's subjective complaints, and Dr. McCrea's statement that her fatigue is sporadic.

On the basis of this review, the surveillance video, and its interview with Plaintiff, Defendant terminated Plaintiff's benefits. Plaintiff appealed the termination decision on July 23, 2012, and explained that her "disability derives from her inability to work a full day and travel due to fatigue and vertigo, which are the essential functions of her job, not any sedentary job." (HA 00096).

As part of the appeal process, Defendant conducted an occupational analysis and determined that Plaintiff's job, as performed in the national economy, is analogous to "Manager, Procurement Services." Defendant noted that the physical requirements of Plaintiff's job at OSF are in excess of those required of the more generic "Manager, Procurement Services," and also noted that Plaintiff's job at OSF required "marginal travel." However, the analyst concluded that travel is not an essential function of "Manager, Procurement Services."

Defendant also conducted a second so-called independent review, and requested that Dr. Robert Cooper, Board Certified in Endocrinology and Internal Medicine, comment on Plaintiff's restrictions, limitations, and functionality from February 27, 2012 forward. Dr. Cooper reviewed Plaintiff's medical records and reached out to Dr. Getz, Dr. McCrea, and Plaintiff's treating ophthalmologist, Dr. Cuite. Dr. Cooper did not speak with Dr. McCrea. Dr. Getz's assessment of Plaintiff was consistent with his prior assessments. Dr. Cuite concluded that there were no ophthalmological findings that suggest Plaintiff had restrictions or limitations. Like Dr. Alghafeer, Dr. Cooper concluded that "there is no evidence from review of the

information provided, that there are physical findings on examination or on imaging that Sjogren's disease is impairing or would lead to any restrictions or limitations from 2/27/2012 forward."

Finally, Plaintiff also applied to the Social Security Administration for disability benefits. The Social Security Administration denied her claim on November 15, 2011, and concluded that Plaintiff was still able to do the work associated with her job.

## DISCUSSION

Defendant moves for summary judgment on the ground that Plaintiff has not provided any objective evidence that she met the policy's definition of disability. Rather, Defendant argues that the only evidence that Plaintiff has presented regarding her level of functionality is based solely on her descriptions of self-reported fatigue. Plaintiff moves for summary judgment on the ground that the evidence unanimously shows that she could not complete the essential duties of her occupation.

As explained below, both parties' motions are denied. Defendant's insistence that the Court review only objective evidence and not consider Plaintiff's self-reported evidence is inconsistent with the Court's responsibilities when conducting *de novo* review. Furthermore, Plaintiff's treating physicians have presented evidence that the types of objective tests that Defendant demands do not exist for Plaintiff's particular disabilities. Meanwhile, Plaintiff's claim that there is undisputed evidence establishing her disability is based upon an unsuccessful effort to exclude evidence that contradicts her claims. Because Plaintiff's self-reported

lack of functionality constitutes evidence that the Court can consider, and because Defendant's so-called independent consultants and the decision of the Social Security Administration, among other evidence, contradict Plaintiff's evidence, there is a triable issue that the Court cannot resolve on the papers and must resolve after a bench trial.

## I. The Plan's Definitions of Disability

As a threshold matter, the Court must determine how it will measure whether Plaintiff is disabled. Litigation under ERISA by plan participants seeking benefits should be conducted like contract litigation. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 112-13 (1989). Therefore, the definition of disability/disabled in the Plan controls.

The Plan contains two relevant definitions of disability/disabled after the expiration of the Elimination Period. Under the first, a person is disabled "for 24 months following the Elimination Period" if they are "prevented from performing one or more of the Essential Duties of Your Occupation. . . ." (HA 00011) After that, a Plan participant is disabled if they are "prevented from performing one or more of the Essential Duties of Any Occupation." (*Id.*).

As to the first definition of disability/disabled, the parties dispute the Essential Duties of Plaintiff's occupation. Plaintiff asserts that regular travel is an Essential Duty, and further asserts that her disabilities affect her ability to engage in that type of travel. Defendant asserts that regular travel is not an Essential Duty.

The Court concludes that regular travel is not an Essential Duty of Plaintiff's occupation. Although Plaintiff may realistically need to travel on a regular basis, the Plan defines Your Occupation more generally. It is "Your Occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job You are performing for a specific Employer or at a specific location." (HA 00015). Therefore, the fact that Plaintiff needed to travel as part of her job with OSF is irrelevant because it relates to a specific job that she performs for her specific employer. Defendant has identified an analogous job in the general workplace that does not require travel. Plaintiff insists that travel is an Essential Duty of the job, but has not provided a suggestion to counter Defendant's. Therefore, the Court concludes that travel is not an Essential Duty of Plaintiff's occupation.

The Court limits its review to determining whether Plaintiff meets this first definition of disability/disabled, and will not consider whether Plaintiff meets the second, more stringent definition of disability/disabled. A Plan participant meets the second definition if they are "prevented from performing one or more of the Essential Duties of Any Occupation." (HA 000011). Defendant suggests that this issue is not ripe for review because the Plan never reached a determination on this matter. Plaintiff argues that the matter is ripe for review because it is now more than twenty-four months after the expiration of the Elimination Period, and Plaintiff would therefore need to meet the more stringent definition in order to continue receiving benefits into the future.

Pursuant to the Seventh Circuit's decision in *Pakovich v. Broadspire Services, Inc.*, the question of whether Plaintiff meets the more stringent definition of

disabled is not ripe for review. *See* 535 F.3d 601, 606-07 (7th Cir. 2008). In *Pakovich*, the Seventh Circuit held that a district court could not determine whether a Plaintiff was entitled to benefits under an "any occupation" standard because the ERISA Plan never made such a determination. *See id.* at 607. Plaintiff attempts to distinguish *Pakovich* by pointing out that the Plan's determination was subject to arbitrary and capricious review rather than *de novo* review. Therefore, Plaintiff argues that the district court was restricted to the administrative record and had to review the determination of the Plan fiduciary. Here, however, Plaintiff argues that the Plan's failure to decide whether Plaintiff is disabled pursuant to the second definition is irrelevant because the Court must make an independent decision.

Plaintiff's argument is persuasive as a matter of efficiency, but fails as a matter of law. Should Plaintiff prevail on her claim that she meets the less stringent definition of disability, she may well need to proceed back to step one. The Plan may well terminate her benefits again, and she may need to file yet another lawsuit. That, however, is a consequence of a rule announced by the Seventh Circuit. In *Pakovich*, the Court explicitly "adopt[ed] the first part of the Eighth Circuit's rule," and held that "when a plan administrator has not issued a decision on a claim for benefits that is now before the courts, the matter must be sent back to the plan administrator to address the issue in the first instance." *Id.* This decision relied upon the reasoning of the Eighth Circuit in *Seman v. FMC Corp. Retirement Plan for Hourly Employees*, 334 F.3d 728 (8th Cir. 2003). In *Seman*, the Eighth Circuit concluded, "When a plan administrator fails to render any decision

whatsoever on a participant's application for benefits, it leaves the courts with nothing to review *under any standard of review*." *Id.* at 733 (emphasis added). Because the Seventh Circuit explicitly adopted this rule from *Seman*, and because the Court in *Seman* did not distinguish between *de novo* review and arbitrary and capricious review, the Court will not draw that distinction here.

Therefore, the Court will restrict its review at trial to whether Plaintiff can function under the "Your Occupation" standard, and the Court will not consider the ability to travel to be an Essential Duty of Plaintiff's Occupation.

## II.     Plaintiff's Evidence of Disability and Inability to Complete Essential Aspects of Her Job

Having decided the threshold matter, the Court begins by considering Defendant's motion, which asserts that Plaintiff has not produced appropriate evidence that she lacks the necessary functionality to do her job. Defendant's primary argument is that Plaintiff's claim that she cannot adequately fulfill the essential duties of her job is only supported by her own self-reported limitations. To support her claim that she is disabled, Plaintiff has produced her own affidavit, in which she outlines her limitations and describes her symptoms, an affidavit prepared by her husband which corroborates her own affidavit and describes the effect her illness has had on their lives as a couple, an affidavit from her primary care provider Dr. McCrea, and reports from her rheumatologist, Dr. Getz. Both Dr. McCrea and Dr. Getz acknowledge that their assessment of her limitations is based upon Plaintiff's self-reports.

In support of its argument, Defendant relies upon *Williams v. Aetna Life Insurance Company*, 509 F.3d 317 (7th Cir. 2007). In *Williams*, the Seventh Circuit

held that an ERISA plan did not act in an arbitrary and capricious manner when it denied a truck driver's claim for long term disability based on chronic fatigue syndrome because the driver failed to provide objective evidence of his functional limitations. *See id.* at 322-23. There, the Seventh Circuit acknowledged that chronic fatigue syndrome "poses unique issues for plan administrators, since . . . its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Id.* at 322 (internal quotations omitted). However, the court distinguished between "the amount of fatigue or pain an individual experiences," and "how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured." *Id.* As the Seventh Circuit had previously held in *Hawkins v. First Union Corp. Long-Term Disability Plan*, it is arbitrary and capricious for ERISA plans to reject a claim for disability on the ground that the severity of the condition cannot be objectively measured when the severity of the symptoms themselves are entirely subjective. 326 F.3d 914, 916, 919 (7th Cir. 2003). *Williams* suggests however, that it is possible to obtain objective evidence of functionality even for diseases where only subjective evidence of severity is available. 509 F.3d at 322.

*Williams* does not stand for the proposition that claimants must produce objective evidence of reduced functionality in order to succeed on an ERISA benefits claim. Rather, *Williams* stands for the proposition that a plan reviewer does not act in an arbitrary or capricious manner when the plan policy does not prohibit the reviewer from giving objective evidence dispositive weight and the reviewer gives objective evidence dispositive weight. The plan guidelines in *Williams* required that

the reviewer "[c]onsider subjective complaints of the claimant as well as objective evidence," but other aspects of the Plan guidelines made it clear to the court that reviewers were not barred "from requiring accurate documentation from a treating physician that the claimant's subjective symptoms of pain or fatigue limit his functional abilities in the workplace." *Id.* at 323. Therefore, the reviewer in *Williams* had some latitude to weigh conflicting facts or require other facts in rendering a decision.

Meanwhile, in *Diaz*, the Seventh Circuit considered another ERISA claim in which the claimant relied upon subjective evidence in order to prove disability. There, unlike *Williams*, the court engaged in *de novo* review. *See* 499 F.3d at 643. The policy at issue in *Diaz* also specifically distinguished between objective evidence and subjective evidence. It placed a twenty-four month cap on disabilities that "are primarily based on self-reported symptoms." *Id.* at 645. The court concluded that that provision "erase[d] any doubt" that the claimant was entitled to some benefits, and remanded the case so the district court could determine whether the claimant was "entitled to benefits notwithstanding the fact that some of his evidence consists of subjective reports of his pain [, w]hether that evidence is the primary basis of his claim, whether his disability was in fact verified by the kinds of tests and procedures the Plan mentions, or whether the 24-month limit on the duration of benefits applies here." *Id.* at 646.

Taken together, *Williams* and *Diaz* demonstrate that there is no requirement in all ERISA cases that Plaintiffs demonstrate lack of functionality through objective evidence. How courts treat objective and subjective evidence of

functionality depends upon both the language of the ERISA plan and the level of review that the court must apply. Here, where the Court has not been directed to evidence that the Plan requires objective evidence rather than subjective evidence, and where the Court is required to consider all evidence before making an independent decision, it cannot grant summary judgment solely because Plaintiff's claim that she lacks functionality is based upon her own complaints rather than a battery of medical tests. Rather, it must independently consider the evidence that she can do her job and independently consider the evidence that she cannot do her job.

Even if the Plan required Plaintiff to produce objective evidence that she could not function in a manner required by her job, the reports of Dr. McCrea and Dr. Getz provide sufficient evidence such that the Court cannot simply disregard them. In *Williams*, the Court concluded that "[t]he residual functional capacity questionnaire submitted to the Plan on appeal could have provided sufficient evidence that Williams's functional abilities were limited by his subjective symptoms of fatigue, but this form was not accurately completed." 509 F.3d at 323. The court suggested that if the claimant's doctor had conducted the battery of tests included in the survey, it could have reached a different result. *Id*. In this case, Defendant did not request that Plaintiff's treating physicians conduct that type functional capacity questionnaire or that they test for particular things. Rather, it simply asked them whether Plaintiff could or could not meet the demands of her job.

These questionnaires can provide the sort of objective evidence that *Williams* imagines, even if they are solely based upon physicians' assessment of self-reported symptoms. As one other district court reasoned:

> The unstated but obvious premise of cases like *Williams* is that a *properly* completed disability questionnaire will often constitute adequate 'objective' evidence of disease . . . that is subjectively experienced. Such a questionnaire represents a physician's opinions, based on examination of the patient, about the patient's limitations. That such a questionnaire may be based on self-reported . . . symptoms is simply a truism: if the disease itself is only subjectively experienced, then any medical assessment of the disease's limitations will necessarily be based on the patient's subjective reports. . . .

*Weitzenkamp v. Unum Life Ins. Co.*, No. 09-C-1017, 2010 WL 4806979, at *5 (E.D. Wis. Nov. 19, 2010), *aff'd in part, rev'd in part*, 661 F.3d 323 (7th Cir. 2011). Dr. Getz reported that Plaintiff's subjective reports present the only source of data that he knows of to assess functionality. To require more could put *Williams*, which held plans can require objective proof of limited functionality, in untenable tension with *Hawkins*, which held that it is arbitrary and capricious to require objective evidence of subjective symptoms. *See Williams,* 509 F.3d at 322; *Hawkins*, 326 F.3d at 919.

For these reasons, the Court concludes that Plaintiff has produced evidence that she did not have the ability to complete the essential functions of her job.

### III.     Defendant's Evidence

In addition to arguing that Plaintiff's evidence of functionality is insufficient to establish disability because it is subjective, Defendant also relies upon affirmative evidence that Plaintiff is not disabled. This includes statements by two of Plaintiff's treating physicians – Dr. Parrish and Dr. Cuite – that Plaintiff is not disabled from an ear nose and throat and ophthalmological perspective; the Social

Security Administration's determination that Plaintiff is not disabled; and the conclusions of Dr. Alghafeer and Dr. Cooper, who reviewed evidence produced during the administrative process.

Plaintiff has attempted to explain away or exclude all of this evidence in order to argue that the evidence unanimously shows that she is disabled. Some of her attempts are successful, although others are not. First, Plaintiff argues that the conclusions of Dr. Parrish and Dr. Cuite do not rebut her claims of disability based upon fatigue. This much is correct. Although Dr. Parrish and Dr. Cuite have presented evidence relevant to the effects of the symptoms of her Sjogren's syndrome, they have not provided opinions that are relevant to the effects that cause her to be unable to work.

However, Plaintiff's arguments relating to the Social Security Administration's determination and the opinions of Dr. Alghafeer and Dr. Cooper are less compelling. The SSA's determination that Plaintiff is not entitled to disability benefits is directly relevant to the issue of whether she meets the Plan's definition of disabled. In the SSA's February 2, 2012 letter denying Plaintiff's appeal of its adverse decision, it concluded that her file does not show she cannot perform the essential duties of her job on a full-time basis. Plaintiff argues that the SSA's determination is irrelevant to the instant case, because a determination of an individual's claim for social security benefits is not binding on an ERISA Plan. Although the SSA's determination may not be binding upon the Plan, that does not mean that the determination is irrelevant. Rather, the Seventh Circuit has repeatedly referred to determinations by the Social Security Administration as

relevant in long term disability cases. *See, e.g., Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 610 (7th Cir. 2007) (noting that SSA determinations are often instructive).

Plaintiff attempts to discount the finding of the SSA by arguing that its definition of disability is different from the Plan's definition of disability, and tries to direct the Court's attention away from the SSA's finding that Plaintiff could still do her job by arguing that it "is collateral to the issue before the Social Security Administration, i.e. whether Cullett could perform any kind of substantial work." (Doc. 59 at 20-21). It is true that the Plan has a less stringent definition of disability than the SSA does. However, the SSA was required to make a determination as to whether Plaintiff could continue to do her current job. The SSA employs a five-step sequential evaluation process to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520(a)(1). At the fourth step, the SSA considers whether a claimant has the residual functional capacity to engage in past relevant work. *See id.* at 404.1520(a)(4)(iv). If a claimant does, the SSA concludes they are not disabled and it does not even consider the fifth step, which is the more rigorous question of whether the claimant has the residual functional capacity, age, education, and work experience to engage in other work. *See* 20 C.F.R. § 404.1520(a)(4). Therefore, the SSA's determination that Plaintiff had the functional ability to do her job was a conclusion that was necessary to its determination, is relevant to the question of whether Plaintiff can fulfill the essential duties of her job, and contradicts the opinion of her treating physicians.

The Court's conclusion that the SSA determination effectively contradicts the conclusions of Plaintiff's treating physicians and creates a triable issue of material

fact is enough to deny Plaintiff's motion for summary judgment. However, the Court will address Plaintiff's arguments regarding Defendant's experts, Dr. Cooper and Dr. Alghafeer. Both Dr. Cooper and Dr. Alghafeer reach conclusions that directly contradict the opinions of Plaintiff's treating physicians. Defendant asked Dr. Cooper to comment on Plaintiff's functionality from February 27, 2012 until the time of his review. He reviewed Plaintiff's medical records, reviewed the surveillance video, and spoke with Dr. Getz and Dr. Cuite. On that basis, he concluded that there are no "physical findings on examination or on imaging that Sjogren's disease is impairing or would lead to any restrictions or limitations from 2/27/12 forward." (Def.'s Ex. 15, Doc. 54-31, at 7). After reviewing medical records, consulting with Plaintiff's treating physicians, and reviewing the surveillance video, Dr. Alghafeer concluded that "[t]he claimant is able to function full time, 40 hours a week, without restrictions/limitations." (*See* Def.'s Ex. 11, Doc. 54-27, at 6).

Plaintiff argues that the Court should exclude Dr. Cooper's and Dr. Alghafeer's affidavits in support of Defendant's motion for summary judgment for two reasons. First, Plaintiff argues that Defendant failed to properly disclose Dr. Cooper and Dr. Alghafeer as expert witnesses. Second, Plaintiff argues that Defendant failed to disclose Dr. Alghafeer's report in discovery. Both arguments are unpersuasive.

First, Plaintiff argues that the doctors are both retained experts and that Defendant had an obligation to disclose them under Rule 26(a)(2)(B). She urges the Court to exclude Defendant's witnesses pursuant to Rule 37(c), which sanctions parties who fail to comply with Rule 26(a)'s disclosure requirements by excluding

the information or witnesses unless the failure was substantially justified or harmless. Rule 26(a)(2)(B) requires that parties make certain disclosures for expert witnesses who were "retained or specifically employed to provide expert testimony in the case." Fed. R. Civ. P. 26(a)(2)(B). The expert report must contain a high level of detail, and provide the full reasoning that supports expert opinions. *See Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998). Non-retained experts need not submit a report as part of expert disclosures. *See* Fed. R. Civ. P. 26(a)(2)(C). Rather, they are only required to disclose "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." *Id.*

Dr. Cooper and Dr. Alghafeer are properly considered Rule 26(a)(2)(C) experts who need not submit reports. Often, a defendant will retain experts who can provide an ex post justification for certain actions or inactions. In such a case, it is likely that that the party would need to disclose the experts pursuant to Rule 26(a)(2)(B). Here, however, Defendant retained Dr. Cooper and Dr. Alghafeer ex ante, and their reports and opinions are limited to the opinions that they developed during that time frame. Neither Dr. Cooper or Dr. Alghafeer was retained during litigation, and both learned facts and developed opinions prior to the beginning of litigation. Dr. Alghafeer was consulted before Defendant elected to terminate Plaintiff's benefits, and his opinion contributed to Defendant's decision to terminate them. Defendant disclosed Dr. Alghafeer's conclusions to Plaintiff in a February 27, 2012 letter, over seven months before Plaintiff filed her complaint. Defendant

consulted with Dr. Cooper after Plaintiff appealed its determination. Defendant hired Dr. Cooper to review Plaintiff's file in part because regulations governing the administration of ERISA's long-term disability plans required it to do so. In order for group health plans to provide claimants with a "full and fair review of a claim," the Plan's fiduciary must as part of the appeal process "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. § 2560.503-1(h). Therefore, the Court agrees with Defendant that Dr. Alghafeer and Dr. Cooper are akin to percipient witness who do not need to submit reports. *See Guarantee Trust Life Ins. Co. v. American Med. And Life Ins. Co.*, 291 F.R.D. 234, 237 (N.D. Ill. 2013). Dr. Alghafeer and Dr. Cooper were retained by Defendant prior to the onset of litigation, and Defendant requested their opinions so that it could make decisions that gave rise to the present litigation. They were not retained expressly for litigation. *See id.*

The Court is sensitive to the position that Plaintiff has taken with respect to Dr. Alghafeer and Dr. Cooper. Here, where the Court is reviewing all evidence *de novo*, the testimony of the two doctors begins to look a lot like the testimony of retained experts. Neither doctor physically examined or treated Plaintiff, and both are offered to testify on the basis of their review of Plaintiff's medical records. Furthermore, the fact that the doctors' opinions influenced earlier decisions to terminate benefits is irrelevant from the perspective of *de novo* review, where the Court must weigh evidence independently of any prior decisions or findings of fact made by the Plan's fiduciary. *See Diaz*, 499 F.3d at 643.

However, excluding the doctors' testimony or reports would carve out significant pieces of the administrative record. Such a result would not comport with the decisions of the Seventh Circuit considering the scope of discovery in ERISA cases subject to *de novo* review. In cases where a court reviews the Plan's decision for arbitrariness and capriciousness, review is limited to the administrative record. *See Perlman v. Swiss Bank Corp.*, 195 F.3d 975 (7th Cir. 1999). In *Krolnick,* the Seventh Circuit explained that broader discovery is acceptable and may be necessary when a court reviews a decision *de novo*, but it considered broader discovery as that discovery which occurs in addition to the administrative record. *See* 570 F.3d at 843 ("Medical evidence presented to the plan or its insurer may be placed in the judicial record, and when this evidence is ample it may in principle constitute the whole record . . .If the administrative record contains comprehensive medical evidence, then duplicative discovery may be limited. . . "). In this case, the testimony that the experts will provide is included as part of the administrative record. *See id.* Therefore, the Court concludes that an expert disclosure pursuant to Rule 26(a)(2)(B) is unnecessary.

Second, Plaintiff seeks to exclude Dr. Alghafeer's report because it was not disclosed as part of administrative record. Dr. Alghafeer's report is four pages long and is marked with bates numbers from HA 01067-HA 01070. The report was not produced in discovery; indeed, in discovery, Defendant defined the administrative record as ending with bates number HA 01054. Defendant's counsel admits in a declaration that the report was not produced in discovery, and that he supplemented the administrative record with documents bates-numbered HA

01055-01070 prior to filing its motion for summary judgment. (*See* Decl. of Craig Bargher, Doc. 60-1). Defendant's counsel further admits that he "[t]hrough inadvertence, and not bad faith or willfulness, . . .did not produce the documents . . . to Plaintiff's counsel before filing the Motion for Summary Judgment." (*Id.*).

The Court is inclined to take Defendant's counsel at his word that he failed to disclose the report through inadvertence rather than bad faith. Certain aspects of Defendant's botched supplementation of the record do not look good. For instance, it does not look good that the report is bates-numbered and presented as if it was part of the originally disclosed administrative effort. However, the relative harmlessness of the failed supplementation convinces the Court that it should not strike the report for Defendant's failure to comply with Rule 26(e). If it looked like Defendant had attempted to withhold evidence or surprise Plaintiff, perhaps the Court would think differently. But that was not the case. First, Plaintiff was well aware of Dr. Alghafeer's conclusions. The produced administrative record included a summary of Dr. Alghafeer's report. (HA 00111), and Defendant's letter terminating Plaintiff's benefits on February 27, 2012 included both a summary of Dr. Alghafeer's opinions and a summary of the information that he reviewed. (HA 00264). Plaintiff responded to Dr. Alghafeer's opinion in a July 23, 2012 letter contesting the termination of benefits. (*See* HA 00086-87). This response tracks Plaintiff's arguments in its response brief. (*See* Doc. 59 at 46). Second, Defendant disclosed Dr. Alghafeer as an expert. Plaintiff had the opportunity to depose him but declined to do so because of cost constraints. (*See* Doc. 46 at 12). For these reasons, the Court concludes that Defendant's failure to produce Dr. Alghafeer's report in response to

Plaintiff's discovery requests is harmless and declines to exclude it on these grounds. *See* Fed. R. Civ. P. 37(c).

Therefore, Defendants have produced evidence, namely the reports of Dr. Cooper and Dr. Alghafeer, as well as the SSA's determination, that directly contradict the opinions of Plaintiff's treating physicians. The court may not resolve these conflicting material facts on the papers at the summary judgment stage.

## CONCLUSION

IT IS THEREFORE ORDERED THAT Plaintiff's Motion for Summary Judgment (Doc. 53) and Defendant's Motion for Summary Judgment (Doc. 54) are denied. The Court will not consider whether Plaintiff is disabled under the "any occupation" standard, but a bench trial is necessary to determine whether Plaintiff is disabled under the "your occupation" standard.

Entered this 14th day of November, 2014.

s/Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge